EDWARDS & ANGELL LLP
Donald E. Frechette
90 State House Square
Hartford, CT 06103
Phone: (860) 541-7713
Fax: (888) 527-4198
*Attorneys for Plaintiff Vertrue Incorporated*

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| VERTRUE INCORPORATED,<br><br>              Plaintiff,<br><br>-versus-<br><br>ROBERT GRAHAM and MICHAEL SHANE,<br><br>              Defendants. | Case No.: 3:04CV2128MRK<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Vertrue Incorporated ("Vertrue"), as and for its complaint herein, alleges as follows:

### NATURE OF THE COMPLAINT

1. This action arises out of defendants' fraud and, ultimately, their theft of millions of dollars from MemberWorks Incorporated (Vertrue's predecessor-in-interest, and hereinafter referred to as "MemberWorks"). In particular, defendants' company, Vital Basics, Inc. ("VBI"), acted as a marketer for MemberWorks' services. In connection with that business relationship, MemberWorks overadvanced almost $4 million to VBI, monies that VBI was obligated to repay to MemberWorks. Rather than satisfy VBI's lawful debts, defendants instead used a series of fraudulent statements and omissions to induce MemberWorks to forego repayment and to

- 1 -

continue to do business with VBI. To make matters worse, at the same time as they were misleading MemberWorks, defendants were busily stripping VBI of its cash, transferring that money to themselves as shareholder "distributions" (which they belatedly then recharacterized as undocumented "loans"), and converting the monies overadvanced by MemberWorks to their own personal benefit.

Defendants' fraudulent and deceptive conduct has already resulted in an arbitration award in MemberWorks' favor against VBI for approximately $5 million, including $1.34 million in punitive damages. Because VBI has since filed bankruptcy in a further effort to dodge its obligations to MemberWorks, MemberWorks now brings this claim against defendants for their individual wrongs.

## PARTIES

2. Vertrue is MemberWorks' successor in interest. Vertrue is a publicly traded corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business located in Stamford, Connecticut. At all times relevant to this complaint, MemberWorks marketed and sold consumer discount membership programs in such areas as healthcare, shopping, travel, entertainment and personal security.

3. Defendant Robert Graham ("Graham") is the President, co-Chief Executive Officer, and a 50% shareholder of VBI. VBI is currently the subject of bankruptcy proceedings pending in the United States Bankruptcy Court for the District of Maine. Graham and defendant Michael Shane ("Shane") personally controlled, directed and performed virtually all of VBI's business with MemberWorks. Graham resides at 35 Watergate Drive, Sarasota, Florida.

4. Defendant Shane is the co-Chief Executive Officer and a 50% shareholder of VBI. Shane resides at 351 East 51st Street, New York, New York.

## JURISDICTION

5.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 because complete diversity of citizenship exists between Vertrue and the defendants, and the matters in controversy exceeds Seventy Five Thousand Dollars ($75,000), exclusive of interest and costs.

6.  Venue is proper pursuant to 28 U.S.C. §1391 (a) (2) and (3). In particular, many of the fraudulent statements giving rise to defendants' liability occurred within this judicial district. In addition, and in accordance with Conn. Gen. Stat. § 52-59b (a), defendants: (1) transacted business within Connecticut; (2) committed tortious acts within this state; and (3) committed tortious acts outside Connecticut which they reasonably believed would cause, and which did cause, injury to persons within this state, all while also deriving substantial revenue from goods and/or services rendered within this state.

## FACTUAL HISTORY

7.  On or about June 1, 2001, MemberWorks entered into an agreement with VBI, then known as Talk America, Incorporated (as thereafter amended, the "Agreement"). Under the Agreement, VBI agreed to market certain of MemberWorks' membership programs to consumers who called VBI's toll-free telephone number to purchase its purported "memory enhancement pills," which pills were marketed under the trade name "Focus Factor." A copy of the Agreement and all of its relevant amendments are attached hereto as Exhibits A-H.

8.  The process by which MemberWorks' programs would be sold to customers that called in to VBI's call center to purchase Focus Factor was referred to by the parties as "upselling."

9.  Under the Agreement, VBI was to upsell a MemberWorks healthcare program known as the Vital Health Club, as well as a household goods program known as the Vital Home

Club (these two MemberWorks programs are hereinafter collectively referred to as the "Programs," or individually as a "Program").

10. Each time VBI enrolled a consumer in one of the Programs, and provided that consumer did not cancel their membership within the first three hundred days thereafter, VBI earned a percentage of the Program's annual membership fee as a commission. Consequently, VBI did not earn a commission on a particular membership "sale" until almost one year after the initial enrollment.

11. VBI, however, did not want to wait a year to receive the cash it might ultimately earn under the Agreement. Accordingly, the Agreement provided that MemberWorks would advance anticipated commission payments to VBI on a monthly basis (the "Advances"). The Agreement also created a "true-up" mechanism, whereby the anticipated commission amounts would be adjusted, up or down, to reflect what VBI had actually earned during the relevant time period.

12. From and after July 2001, the monthly calculation of Advances depended primarily on several factors: (i) the number of consumers enrolled in the prior month; (ii) an agreed-upon projection of the percentage of such newly-enrolled consumers that the parties anticipated would retain their membership for the required period (the "Projected Retention Rate"); (iii) the retail price of the Program(s) in which such consumers enrolled; (iv) a percentage of the retail price of the Program that VBI was entitled to collect as a commission; and (v) credits or debits based on the application of actual historic retention figures against the Projected Retention Rate.

13. The Agreement initially forecast a forty percent (40%) Projected Retention Rate because MemberWorks and VBI believed that forty percent (40%) of enrolled consumers would

remain members for the requisite time period and would pay the annual membership fee, while the remaining sixty percent (60%) of enrollees would cancel at some earlier date.

14. The Agreement gave MemberWorks the right to review the Protected Retention Rate at the end of each three-month cycle, beginning with the end of the three-month period following the Agreement's Effective Date (as that term is therein defined). Upon such review, the Projected Retention Rate would be adjusted to reflect the actual membership retention rate for the three-month cycle just ended.

15. MemberWorks and VBI contemplated that the actual retention rate might deviate from the Projected Retention Rate over time. The Agreement thus provided that MemberWorks would both prospectively and retrospectively reconcile the amount of commissions it advanced to VBI to make them consistent with the actual retention rate then being experienced.

16. Prospective reconciliation would be effectuated by adjusting the Projected Retention Rate used for a given month's Advance (initially set at forty percent (40%), as described above) to more closely approximate the actual retention rate experienced for the three-month period immediately preceding the adjustment.

17. Retrospective reconciliation would be accomplished by performing a "true-up" of the amount of commissions MemberWorks had already advanced for a particular month to either reduce or increase that Advance based on the actual retention rate being experienced for consumers VBI enrolled during that month.

18. Such retrospective "true-up" calculations occurred 150 and 300 days after each Advance, and the resulting difference was credited to or debited against the current month's Advance owed to VBI.

19.  At the end of 2002 and beginning of 2003, VBI unilaterally, and without notice to MemberWorks, changed its marketing and sales strategies to make them more aggressive.

20.  In particular, under its previous marketing scheme, VBI charged its customers for Focus Factor pills only once – on the day of the sale. Subsequently, VBI began charging its customers for Focus Factor once on the day of sale (for shipping and handling), again twenty-one days later, and then every ninety days for additional pill shipments.

21.  Only after these same customers were charged <u>twice</u> during the first twenty-one days for VBI's Focus Factor were they then charged (thirty days later) for MemberWorks' first upsold Program. Customers were not charged for the second upsold Program until sixty days after the initial sale. By the time these same customers were charged for membership in the Programs, many of them, presumably annoyed with the repeated charges, cancelled their MemberWorks Program memberships. Naturally, this resulted in a dramatic drop-off in the retention rate of consumers that VBI enrolled in the Programs.

22.  Until VBI changed its marketing tactics, Advances from MemberWorks had been calculated using the Agreement's forty percent (40%) Projected Retention Rate, and actual experience had been consistent with that projected rate.

23.  MemberWorks, unaware of VBI's unilaterally imposed change in marketing strategy, continued to make Advances based on the historically accurate Projected Retention Rate of forty percent (40%). However, as a result of VBI's new strategy, actual retention rates for the Programs dropped precipitously.

24.  The precipitous decline in actual customer retention resulted in VBI receiving overadvanced commission payments totaling millions of dollars.

25. When MemberWorks became aware of the significant, and increasing, overadvances, it notified VBI and took steps (pursuant to the Agreement) to reduce ongoing Advances to adjust for the overpayments and to recoup the money due it from VBI.

26. One step MemberWorks took was to prospectively revise the Projected Retention Rate from the historically accurate forty percent (40%) to reflect the more recently experienced retention rate of approximately twenty five and seven tenths percent (25.7%).

27. On May 6, 2003, MemberWorks wrote VBI, informing it that actual retentions justified a reduction of the Projected Retention Rate. A copy of the May 6, 2003 letter is attached hereto as Exhibit I (the "May Letter").

28. In the May Letter, MemberWorks also agreed to make an Advance larger than that which would be due VBI using the newly adjusted Projected Retention Rate, so long as VBI agreed to pay that excess amount back to MemberWorks from the following month's Advance.

29. After learning that MemberWorks intended to lower the Projected Retention Rate, defendants bitterly complained to MemberWorks, and specifically represented that such a reduction would result in a serious disruption to VBI's cash flow and that, consequently, VBI might not be able to pay its operating expenses.

30. Defendants also represented to MemberWorks that VBI did not have sufficient time to adjust its media spending and other company expenses in order to accommodate the lower cash flow.

31. Defendants also claimed VBI itself was "surprised" by the significantly lower retention rates that necessitated MemberWorks' adjustment of the Projected Retention Rate. Unbeknownst to MemberWorks, however, VBI had already seen the negative impact its

marketing change had had on the retention of program enrollees and, in fact, had internally acknowledged that a lower Projected Retention Rate was to be expected.

32. Citing the need to continue receiving Advances to keep VBI operational, as well as VBI's supposed inability to adjust the company's media spending and other expenses, defendants asked MemberWorks for a further financial accommodation. In particular, they requested that, for an additional two months, MemberWorks "float" VBI the $574,540 overadvance referred to in the May Letter.

33. In an effort to maintain a good working relationship with VBI, and relying on defendants' repeated representations, MemberWorks agreed to the request, which agreement was, following a meeting in Stamford, Connecticut between MemberWorks and defendants, memorialized in a May 9, 2003 letter from MemberWorks to VBI. In that letter, MemberWorks agreed to provide an additional $574,540 to VBI in May's Advance payment, even though VBI had not yet earned that money, and VBI agreed to repay that $574,540 in July 2003. A copy of the May 9, 2003 letter agreement is attached hereto as Exhibit J.

34. In addition to the $574,540 in unearned commissions MemberWorks advanced to VBI in May 2003, MemberWorks advanced VBI additional unearned commission payments of $274,803 in June 2003, $176,380 in July 2003, and $15,592 in August 2003, all on the basis of defendants' representations as aforesaid.

35. At the same time they were making representations to MemberWorks about VBI's dire cash flow problems, and knowing VBI was running up a significant overadvance liability that would have to be repaid to MemberWorks, defendants began stripping millions of dollars of cash out of VBI, transferring that money to themselves as "distributions," and

manipulating VBI's books and records to prevent MemberWorks from ever recovering the overadvances.

36. Defendants transferred over $730,000 of VBI's cash to themselves in May 2003 alone, all while representing to MemberWorks that VBI needed an extra $574,540 from MemberWorks to cover its operating expenses.

37. From January 1 to November 2, 2003, defendants drained VBI of over $5 million in "distributions" to themselves for their personal benefit.

38. When they learned that VBI was, from an accounting standpoint, unable to make any "distributions" to them since it enjoyed no profits during the relevant time period, the defendants deftly recharacterized their blatant misappropriations as undocumented "loans," thereby also supposedly avoiding the need to pay taxes on the funds so received. The "loans" have no definite terms of repayment, and defendant Shane has candidly admitted he has no intention of paying his debt to VBI except to the extent he receives further distributions from it.

39. During a June 3, 2003 meeting between MemberWorks and VBI that took place in MemberWorks' Stamford, Connecticut office, MemberWorks informed VBI that the total overadvanced amount was $3.8 million. Both Graham and Shane attended and actively participated in the June 3, 2003 meeting.

40. Defendants allowed MemberWorks to overadvance $3.8 million to VBI despite knowing that VBI's newly implemented marketing strategies had adversely affected retention rates, and that they were actively engaged in looting VBI's treasury for their personal gain.

41. After the defendants unjustly remunerated themselves, they further, and without justification, caused VBI to virtually cease sales of the Programs, thereby preventing VBI from reducing the overadvances previously made to it by MemberWorks. Indeed, all of defendants'

actions demonstrate that they never intended to allow VBI to repay its debt to MemberWorks or to fulfill any of the promises made to MemberWorks as herein described. Instead, the defendants simply used VBI to stall and delay, all while draining it of cash.

42. Between January 1 and November 2, 2003, defendants stripped over $5 million out of VBI for their own benefit, although they later "repaid" VBI approximately $1.2 million. Curiously, the amount defendants removed from VBI less the amounts repaid – $3.8 million – just happens to equal the original amount of VBI's liability to MemberWorks for the overadvances.

43. On September 16, 2003, MemberWorks filed a Demand for Arbitration against VBI with the American Arbitration Association ("AAA"), asserting claims for breach of contract, violation of the Connecticut Unfair Trade Practices Act, conversion, unjust enrichment and injunctive relief for the above-described conduct.

44. Incredibly, VBI's and the defendants' fraudulent conduct continued. In particular, during the course of the arbitration, and following repeated discovery compliance orders by the arbitrators and, ultimately, the entry of a sanction award, VBI unwittingly produced two sets of financial records for the month of May 2003, the second set of which fully supported MemberWorks' claims in the arbitration. Despite being responsible for VBI's fiscal affairs, neither of the defendants could credibly explain the conflicting sets of financial records. VBI's two sets of books provide further evidence that defendants attempted to conceal the extent of their financial machinations from MemberWorks.

45. On December 2, 2004, a three-member panel of the AAA (the "Panel"), after nine full days of hearings, delivered to MemberWorks and VBI an Award of Arbitrators (the

"Award"). In the Award, the Panel found in MemberWorks' favor on all factual and legal issues. A copy of the Award is attached hereto as Exhibit K.

46. The Panel specifically found, among other things, that VBI had violated Connecticut's Unfair Trade Practices Act:

> [VBI] engaged in unfair and deceptive acts and practices under the Connecticut Unfair Trade Practices Act in that [VBI] (a) made fraudulent misrepresentations to induce [MemberWorks] to continue making monthly advances, (b) made fraudulent misrepresentations to induce [MemberWorks] to delay the enforcement of its contractual rights, (c) misappropriated [MemberWorks'] marketing methods and customer retention strategies and used those methods and strategies in marketing a directly competitive product, (d) after receiving demand from [MemberWorks] for the return of over-advances in the amount of $3,800,000, [VBI] depleted its cash assets in approximately the same amount, by making distributions to its two shareholders, (e) repeatedly failed and refused to produce timely discovery documents requested.

47. It is the law in this Circuit that an arbitration award, even an unconfirmed award, should be given collateral estoppel effect in derivative claims based on the same alleged misconduct. See, e.g., Drexel Burnham Lambert Group, Inc. v. The DBL Liquidating Trust, 161 B.R. 902 (S.D.N.Y. Dec. 22, 1993). Accordingly, defendants should be collaterally estopped from disputing any of the factual and/or legal determinations made by the Panel.

**AS AND FOR A FIRST CLAIM FOR RELIEF**
**(Fraud, including Fraud in the Inducement)**

48. Vertrue repeats and realleges each of the allegations contained in paragraphs 1-47 as if fully set forth herein.

49. Upon hearing from MemberWorks that it wanted to take steps to recoup the overadvances, defendants misrepresented to MemberWorks that any efforts to begin recoupment

would leave VBI without enough cash to remain operational. In fact, the defendants further represented that additional Advances would have to be made if VBI was to survive.

50.   At the same time defendants were making such misrepresentations to MemberWorks, they were transferring millions of dollars of operating cash out of the company as undocumented "distributions" to themselves, all without informing MemberWorks that they were doing so.

51.   Defendants' representations regarding VBI's fiscal health and capabilities were untrue. Moreover, given their representations regarding VBI's lack of fiscal health, the defendants' failure to inform MemberWorks of the "distributions" (later reclassified as "loans") constituted a further fraud.

52.   Defendants knew that their representations were untrue at the time they made them to MemberWorks, and similarly knew that their omissions, when considered under the surrounding circumstances, were also fraudulent.

53.   Defendants made such false representations and omissions for the sole purpose of inducing MemberWorks to act upon them. In particular, MemberWorks was reasonably induced to delay in the enforcement of its contractual rights and, further, to continue paying VBI unearned Advances.

54.   MemberWorks was damaged by its reasonable reliance on the defendants' false representations and fraudulent omissions.

55.   Vertrue, as MemberWorks' successor in interest, has suffered injury as a result of defendants' fraud.

## AS AND FOR A SECOND CLAIM FOR RELIEF
### (Civil Theft)

56. Vertrue repeats and realleges each of the allegations contained in paragraphs 1-55 as if fully set forth herein.

57. Through their false representations and fraudulent omissions to MemberWorks about VBI's dire fiscal health, defendants convinced MemberWorks to forebear from implementing its contractual remedies, and to continue providing unearned Advances to VBI.

58. Defendants, with the intent to deprive MemberWorks of the funds owed it from VBI, have wrongfully distributed monies to themselves and have wrongfully withheld such funds from MemberWorks.

59. Vertrue, as MemberWorks' successor in interest, has been damaged as a result of defendants' civil theft.

60. In accordance with Conn. Gen. Stat. §52-564, Vertrue, as MemberWorks' successor in interest, is entitled to recover treble damages.

## AS AND FOR A THIRD CLAIM FOR RELIEF
### (Conversion)

61. Vertrue repeats and realleges each of the allegations contained in paragraphs 1-60 as if fully set forth herein.

62. Through their false representations and fraudulent omissions to MemberWorks, defendants convinced MemberWorks to continue making unearned Advances to VBI.

63. At the same time, defendants were transferring millions of dollars of operating cash out of VBI to themselves as undocumented "distributions."

64. Defendants have assumed and exercised the rights of ownership over the unearned commission payments that VBI collected from MemberWorks, which defendants then "distributed" to themselves for their benefit. That money belongs to MemberWorks.

65. Defendants have refused to pay the funds they converted to MemberWorks, despite repeated demands therefor.

66. MemberWorks was directly harmed as a result of defendants' conversion of millions of dollars of MemberWorks' money.

67. Vertrue, as MemberWorks' successor in interest, has been damaged as a result of defendants' conversion.

## AS AND FOR A FOURTH CLAIM FOR RELIEF
### (Unjust Enrichment)

68. Vertrue repeats and realleges each of the allegations contained in paragraphs 1-67 as if fully set forth herein.

69. Defendants received a benefit from MemberWorks because of their misrepresentations, fraudulent omissions and wrongful conduct, all as aforesaid.

70. Defendants unjustly failed to pay MemberWorks for the benefits they received, which was to MemberWorks' detriment.

71. Under the circumstances, it would be wholly inequitable for the defendants to retain the benefit they obtained from MemberWorks through their misrepresentations, fraudulent omissions and wrongful conduct, all as aforesaid.

72. Vertrue, as MemberWorks' successor in interest, has been damaged as a result of defendants' unjust enrichment.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
### (Fraudulent Transfer,
### <u>Conn. Gen. Stat.</u> §§ 52-552e and 52-552f)

73. Vertrue repeats and realleges each of the allegations contained in paragraphs 1-72 as if fully set forth herein.

74. Upon hearing that MemberWorks wanted to take steps to recoup the overadvanced money from VBI, defendants engaged in a series of fraudulent statements and omissions designed to cause MemberWorks to forbear in the exercise of its contractual rights and, further, to continue to advance unearned monies to VBI.

75. At the same time, defendants were transferring millions of dollars of operating cash out of VBI as undocumented "distributions" to themselves without informing MemberWorks that they were doing so.

76. MemberWorks' claim to the overadvanced commission payments that VBI owed to MemberWorks arose before defendants made the undocumented "distributions."

77. Defendants made the "distributions" of VBI's operating cash to themselves with the actual intent to hinder, delay or defraud MemberWorks. Defendants knew that MemberWorks was owed $3.8 million in overadvanced commission payments but continued to remove operating cash from VBI to prevent MemberWorks from being re-paid the $3.8 million.

78. The amount of the undocumented "distributions" of VBI's operating cash that defendants made to themselves was sufficient to discharge VBI's indebtedness to MemberWorks.

79. In addition, the "distributions" were made to the defendants without an exchange of reasonably equivalent value, and at a time when VBI was insolvent or, as a consequence of the "distributions," was rendered insolvent.

80. Vertrue, as MemberWorks' successor in interest, has been damaged as a result of defendants' fraudulent conveyance.

### AS AND FOR A SIXTH CLAIM FOR RELIEF
#### (Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, et seq.)

81. Vertrue repeats and realleges each of the allegations contained in paragraphs 1-80 as if fully set forth herein.

82. Defendants' actions as herein described were in furtherance of VBI's activities in "trade" or "commerce," as defined in Conn. Gen. Stat. §42-110a(4).

83. As a consequence of defendants' actions, MemberWorks sustained a tangible and substantial loss of money.

84. Defendants' actions were immoral, oppressive, unscrupulous and violative of public policy.

85. Defendants' actions constitute a violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, et seq.

86. Under the holding of Drexel Burnham Lambert Group, supra, the arbitration award rendered against VBI should be given collateral estoppel effect as against the defendants.

87. Vertrue, as MemberWorks' successor in interest, has been damaged as a result of defendants' unfair or deceptive acts or practices.

**WHEREFORE**, plaintiff, Vertrue Incorporated, demands judgment against defendants Robert Graham and Michael Shane as follows:

a. On the first claim for relief for fraud, awarding Vertrue compensatory and punitive damages;

b. On the second claim for relief for civil theft, awarding Vertrue compensatory damages, trebled pursuant to Conn. Gen. Stat. § 52-564;

c. On the third claim for relief for conversion, awarding Vertrue compensatory and punitive damages;

d. On the fourth claim for unjust enrichment, awarding damages;

e. On the fifth claim for relief for fraudulent transfer in violation of Conn. Gen. Stat. § 52-552e, an avoidance of the transfer;

f. On the sixth claim for relief for violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, et seq., awarding Vertrue compensatory and punitive damages;

g. Awarding Vertrue attorney's fees, interest and costs; and

h. Awarding Vertrue such other and further relief as the Court may deem just and proper.

Dated: Hartford, Connecticut
December _16_, 2004

Edwards & Angell, LLP

By: _____
Donald E. Frechette
90 State House Square
Hartford, CT 06103
Phone: (860) 541-7713
Fax: (888) 527-4198
*Attorneys for Plaintiff Vertrue Incorporated*